UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:03CV-20-M

BANK OF NEW YORK                                             PLAINTIFF

v.

JOHN STEPHEN JANOWICK, et al.                               DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court upon cross-motions for summary judgment filed by the Defendant Century Aluminum ("Century") [DN 56] and Crossclaim Plaintiff Southwire Company ("Southwire") [DN 57]. Having been fully briefed, the matter now stands ripe for decision.

For the reasons discussed below, Century's motion for summary judgment **DENIED** while Southwire's motion for summary judgment is **GRANTED**.

## I.  LEGAL STANDARD

The summary judgment standard requires that the Court find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific

facts demonstrating a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts of this case are largely undisputed, and as both parties have moved for summary judgment, the Court reviews the uncontested facts.

## II. BACKGROUND

### A.    Procedural Background

This is the second phase of a bifurcated interpleader determination filed by the Plaintiff, Bank of New York, to determine entitlement to the unanticipated proceeds of an insurance company's demutualization.  The proceeds have been deposited with the Court. In the first part of the action, the Court determined entitlement between a class of former Southwire employees (the "Annuitants") and Southwire, holding that Southwire was entitled to the proceeds.  In this phase of the action, the Court determines the entitlement to the funds as between Southwire and Century Aluminum, a purchaser of one of Southwire's subsidiaries.

### B.  Summary of Facts

In 1970, National Southwire Aluminum Company ("NSA"), a former subsidiary of Southwire, established a pension plan (the "Plan") for the benefit of its employees.  The Plan provided a fixed amount of monthly income for its eligible employees, hence it is referred to as a defined-benefit plan.  The Plan constituted a qualified retirement plan and trust subject to dictates of federal law, including the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(2)(a).  NSA entirely funded the Plan and provided periodic contributions to the Plan in amounts consistent with ERISA regulations.  The funds NSA

contributed were then held in trust by Irving Trust Company, now Bank of New York ("BNY"), for the benefit of the Plan's participants and/or beneficiaries. If there were insufficient assets to satisfy the obligation of the Plan, NSA was responsible for providing additional funds to meet the Plan's obligations.

In 1986, NSA terminated the Plan. According to federal law, the plan funds were used to purchase termination annuities from the Prudential Insurance Company of America ("Prudential"). The beneficiaries under the Plan became the Annuitants under two Group Annuity contracts. The contract-holder of the Group Annuity was the trustee of the Plan, Irving Trust Company. Thereafter, NSA was relieved of its obligation to pay benefits under the Plan. Eleven million dollars of surplus plan assets reverted to NSA pursuant to the terms of the Plan.

In 2001, Prudential, a New Jersey entity, converted its capital structure from that of a mutual insurance company to that of a stock company pursuant to New Jersey law. As part of the conversion, Prudential issued common stock to its policyholders. Consequently, Prudential issued shares of stock to the BNY, as successor of Irving Trust, because BNY was the "contract-holder" of the two Group Annuity Contracts with Prudential. BNY informed Prudential that it neither had an interest in nor a right to the demutualization proceeds. In February, 2003, BNY filed this action because it received conflicting claims from the Annuitants, Southwire, and Century as to the ownership of the Prudential stock. BNY requested, and this Court permitted, BNY to liquidate the shares of stock and deposit the proceeds into its registry. BNY sold the shares, deposited the demutualization proceeds into

the Court's registry, and was dismissed from this suit.  In the first phase of this action, the Court determined that Southwire was entitled to receive the proceeds over the claims of the Annuitants based on principles of trust law and the language of the Plan.  Now the Court must determine whether Southwire or Century is entitled to the proceeds.

As noted, NSA, a subsidiary of Southwire, established the plan in 1970.  Between 1990 and 2001, NSA underwent several name changes and corporate restructures.  In 2001, Southwire sold a subsidiary, Metalsco, to Century.  It is because of the acquisition of Metalsco that Century claims the right to the demutualization proceeds.  It is undisputed that these proceeds were entirely unanticipated and not specifically contemplated in Century and Southwire's negotiations.

### III. DISCUSSION

Century contends that the demutualization proceeds constitute "assets" of Metalsco, a Southwire subsidiary, and were effectively acquired as a result of Century's acquisition of Metalsco.  Southwire initially contends that under the principles of trust law, the proceeds revert to Southwire.[1]  Alternatively, Southwire asserts that Century never acquired rights in the proceeds by the acquisition of Metalsco.  Finally, Southwire asserts that by refusing all responsibility for the pre-existing pension plan, Century effectively relinquished any and all involvement right to the annuity contracts, including the unexpected proceeds that arose from

---

[1]Because the Court finds that Century did not acquire rights to the annuity contracts in conjunction with its acquisition of Metalsco, the Court does not address Southwire's argument regarding trust principles.

them.

Century acquired Metalsco in April, 2001.  Two relevant documents were negotiated between Southwire and Century: the Stock Purchase Agreement and the Redemption Agreement.  The Stock Purchase Agreement provided that Century would purchase all of the outstanding stock of Metalsco, a wholly-owned subsidiary of Southwire, as well as certain "properties and assets necessary for the operation of the Business."  The Stock Purchase Agreement specifically lists the acquisitions of Century, including the "direct or indirect beneficial ownership of all of the Assets."  Section 3.13 of the Stock Purchase Agreement defines the "Assets"  included in the sale:

> all of the assets, properties, including real and personal property, whether tangible or intangible, and the rights which are used or intended for use in or in connection with the Business . . . and with respect to contract rights...all contracts, agreements and other arrangements used or intended to be used in or relating to the conduct of the Business . . . the Assets, include without limitation to following:  (vii) all claims, causes of action, choses in action, rights of recovery and rights of setoff of any kind (including rights to insurance proceeds)...pertaining to, or arising out of, the Business and inuring to the benefit of the Seller or any of its Affiliates . . . (x) all of the Seller's and its Affliliates rights, title and interest in, to and under all other assets, rights and claims of every kind and nature used in the Business.

Section 3.13 limits the scope of "Assets" to properties and rights "used or intended to be used in or relating to the conduct of the Business."  Section 1.1 of the Stock Purchase Agreement defines "Business" to mean "the business of converting alumina into primary aluminum at the Plant and the sale of such primary aluminum, as conducted by Southwire and its Affiliates."

Southwire suggests that its long terminated pension plan, and any rights thereunder,

do not constitute "Assets" intended for use in the manufacture and sale of aluminum.   The Court agrees.   This interpretation is consistent given NSA/Southwires's continued responsibility toward the Plan and Century's express disclaimer of any such responsibility. Section 7.1(c) of the Stock Purchase Agreement states that all Hired Employees shall receive all benefits to which they were entitled under the pre-existing annuity contract and that  the annuity contracts would not be the responsibility of Century.   Clearly, if any liability had arisen with respect to the annuity contracts and the pre-existing pension plan, Southwire would have been responsible.   Other sections of the Stock Purchase Agreement specify the parties' respective responsibilities, or lack thereof, toward  employees.   Section 11.2(a)(v) of the Stock Purchase Agreement further requires Southwire to indemnify, defend and hold harmless Century for "any Liabilities, losses, damages, claims, costs and expenses, interest, awards, judgments and penalties...arising out of or resulting from . . . Liabilities relating to the Employees Benefit Plans maintained prior to the Closing Date by Seller . . . ."

Century and Southwire further agreed that Southwire would redeem out of Metalsco prior to the closing certain properties and liabilities that Century did not want.   To this end, the parties executed a "Redemption Agreement" prior to the closing, in which any "Unwanted Property" was redeemed out of Metalsco.  "Unwanted Property" is defined in the Stock Purchase Agreement as:

> all Property owned or held at any time on or prior to the Closing Date by, and
> any Liabilities of, Metalsco, Skyliner, NSA or any subsidiary of any of them
> or any predecessor of any of the foregoing, other than (i) the Assets, (ii) the
> Liabilities of the Business reflected in the Closing Balance Sheet, and (iii) the
> Assumed Liabilities and any other Liabilities of the Business expressly

assumed hereunder.

The Court further agrees with Southwire that to the extent there were any rights to the annuity contracts remaining in Metalsco, those rights were expressly redeemed out as Unwanted Property.

Century alternatively contends that if the demutualization proceeds were redeemed out, the right would have been reassigned to Century as a "Contract Right of the Business" by operation of Section 2.1 of the Stock Purchase Agreement. The Court rejects this contention as well. The contract rights relating to the business which were conveyed as "Additional Assets" included real property, intellectual property, power contracts, supply contracts and the like. At the time of the sale, the annuity contracts were not viewed as an asset. In truth, neither party foresaw any potential benefit arising from the annuity contracts, only liability. They were not a "right" that Century intended for use "in the business."

## IV. CONCLUSION

The Court concludes that Southwire did not convey any rights as the sponsor of the pre-existing pension plan to Century. To the contrary, the purchase agreement makes it perfectly clear that Century rejected any and all responsibility toward the pre-existing plan. The annuity contracts were not assets which were to be used in the manufacture and sale of aluminum by Century at the Hawesville plant.

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motion filed by Century Aluminum [DN 56] is **denied** and the Motion by Defendant and Crossclaim Plaintiff, Southwire Company, for summary judgment [DN 57] is **granted.**

cc: Counsel of Record
403cv20m, sjmSouthwire